IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


AMANDA I. BORDEN,                    )     CASE NO.  5:20-cv-01391
                                     )
            Plaintiff,               )     MAGISTRATE JUDGE
                                     )     KATHLEEN B. BURKE
        v.                           )
                                     )
COMMISSIONER OF SOCIAL               )
SECURITY,                            )
                                     )     **MEMORANDUM OPINION & ORDER**
            Defendant.               )


Plaintiff Amanda I. Borden ("Plaintiff" or "Borden") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her applications for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 16.

For the reasons explained herein, the Court **AFFIRMS** the Commissioner's decision.

### I.  Procedural History

On August 10, 2017, Borden protectively filed applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI").  Tr. 15, 93, 127, 203-208, 209-212.

Borden alleged a disability onset date of January 1, 2015.  Tr. 15, 203, 209.  She alleged

disability due to seizures, diabetes, neuropathy, atrial fibrillation, mental health issues, bipolar

1

disorder, ADHD, OCD,[1] high blood pressure/cholesterol, and blood clots (legs).  Tr. 59-60, 76-77, 129, 139, 232.

After initial denial by the state agency (Tr. 129-134) and denial upon reconsideration (Tr. 139-150), Borden requested a hearing (Tr. 151-152).  A hearing was held before an Administrative Law Judge ("ALJ") on May 30, 2019.  Tr. 31-58.  On June 12, 2019, the ALJ issued an unfavorable decision (Tr. 12-30), finding that Borden had not been under a disability, as defined in the Social Security Act, from January 1, 2015, through the date of the decision (Tr. 16, 24).  Borden asked the Appeals Council to review the ALJ's decision (Tr. 199-202), and, on April 22, 2020, the Appeals Council denied Borden's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence[2]

### A.      Personal, vocational and educational evidence

Borden was born in 1983.  Tr. 36.  She completed school through the 9th or 10th grade and does not have a GED.  Tr. 36.  At the time of the hearing, Borden was living with her mother and stepfather, husband, and her three children.  Tr. 37.   During the year preceding the hearing, Borden had tried to clean houses with her sister-in-law.  Tr. 46-47.  That work did not last long, however, because Borden had a seizure and her sister-in-law would not pick her up.  Tr. 47.

### B.      Medical evidence

#### 1.      Treatment history

---

[1] Plaintiff indicates she alleged disability in part due to OCD (obsessive compulsive disorder).  Doc. 13, p. 3.  She states that the reference to ODD (oppositional defiant disorder) in the record is a typographical error.  Doc. 13, p. 3, n. 1.

[2] Borden's appeal relates to her mental health impairments.  She does not challenge the ALJ's assessment/evaluation of her physical impairments.  Thus, the evidence summarized herein primarily relates to her mental health impairments.

On May 5, 2016, Borden presented to the emergency room at Summa Health System requesting medication refills for Klonopin, Adderall, Soma, Vicoprofen, and insulin.  Tr. 393. Borden reported having nausea and vomiting for a couple of days.  Tr. 393.  Borden was noted to be experiencing withdrawal symptoms and she was provided with medication refills.  Tr. 394.

A few days later, on May 9, 2016, Borden presented again to the emergency room.  Tr. 461.  She requested detox, explaining that she felt she was dependent upon Vicodin, Adderall, and Klonopin (medications she had been taking for the prior 15 years).  Tr. 461.  Borden was diagnosed with polysubstance dependence and she was transferred to St. Thomas Hospital for detox.  Tr. 457, 462.  A psychiatric consult was ordered.  Tr. 457.  When the psychiatrist arrived on May 10, 2016, for the consult, Borden was sleeping.  Tr. 449.  The psychiatrist noted that he would return the next day.  Tr. 449.  Without completion of detoxification and against medical advice, Borden signed herself out on May 11, 2016.  Tr. 449.

On May 18, 2016, Borden saw Sybil Sims, FNP, at AxessPointe, to establish care.  Tr. 683.  Borden also requested prescription refills and she was interested in referrals for pain management and psychiatric care.  Tr. 683-684.  Nurse Sims referred Borden to Coleman Professional Services ("Coleman").  Tr. 684.  Nurse Sims noted that Borden had a history of anxiety and she was diagnosed with ADD when she was a child.  Tr. 684.  Nurse Sims started Borden on Vistaril, Wellbutrin, and clonazepam (Klonopin).  Tr. 684.  Nurse Sims noted that depression screening showed "severe depression."  Tr. 685.

During a visit with Nurse Sims on July 13, 2016, Borden reported that Wellbutrin was making her moody and mean.  Tr. 678.  Nurse Sims noted that Borden was scheduled for an appointment at Coleman.  Tr. 679.

Borden had a diagnostic assessment completed at Coleman on July 19, 2016.  Tr. 341-359.  Borden reported recently moving from Alabama to Ohio.  Tr. 341.  Borden relayed that she had been involved with mental health services for years, indicating that she had PTSD stemming from a car crashing into her daughter's bedroom; she had ADHD and bipolar disorder diagnoses;[3] she slept walk; and she lived in a "house where [her] mother murdered someone." Tr. 341.  Borden's mother, who was in prison, owned the house that Borden lived in with her husband and children.  Tr. 341.  Borden reported a history of being sexually abused when she was a minor.  Tr. 349.  She also reported being shot.  Tr. 349, 358.  Borden reported seeing and hearing things.  Tr. 350, 353.  She reported having flashbacks and nightmares and a decreased appetite.  Tr. 358.  On examination, the assessor noted that Borden's demeanor/behavior was overstated, cooperative, hyperactive, and Borden exhibited motor/vocal tics.  Tr. 353.  Borden's eye contact was average; her speech was clear but rapid; her mood was "nervous"; her affect was congruent; she had a racing thought process; her thought content had preoccupations (she noted seeing "spirits"); she was not homicidal or suicidal; her attention/concentration were impaired; and her insight/judgment were fair.  Tr. 353-354.  Borden was diagnosed with bipolar disorder, unspecified; bipolar disorder, current episode manic severe with psychotic features; and posttraumatic stress disorder, unspecified; and she was assessed a GAF score of 46[4].  Tr. 357.

---

[3] Borden also had been diagnosed with seizure disorder.  Tr. 345.

[4] As set forth in the DSM-IV, GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.*  With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

Individual counseling, psychiatric services, and case management services were recommended. Tr. 358-359.

On August 17, 2016, Borden attended her first counseling session at Coleman with Martale Davis.[5] Tr. 360-363. Mr. Davis observed that Borden was well-groomed; she was preoccupied, agitated, and restless; her eye contact was average; her speech was pressured; her mood was frustrated; her affect was labile; she had bizarre delusions; she reported visual and auditory hallucinations and compulsions; she exhibited flight of ideas and her thought process was racing and circumstantial; her attention/concentration were impaired; she reported no homicidal or suicidal ideation; her intelligence was estimated to be borderline; and her insight/judgment were poor. Tr. 360-361. Mr. Davis noted that, in addition to reporting auditory and visual hallucinations, Borden experienced hallucinations during the therapy session. Tr. 361. Also, Borden "demonstrated flight of ideas and provid[ed] excessive information when answering a question." Tr. 361. Borden relayed that her bipolar disorder caused "her to react in aggressive ways verbally and [it] ha[d] an impact on her children and husband." Tr. 361. Borden was experiencing some mania with psychotic features. Tr. 361. Mr. Davis observed that Borden did "not appear to be fully stable[]" and her "functioning [was] becoming impaired[.]" Tr. 361.

Borden saw Mr. Davis again on August 31, 2016, for individual counseling. Tr. 364-367. Mental status examination findings were similar to those observed on August 17, 2016, except Borden's mood was both frustrated and angry and there was no indication that Borden was experiencing hallucinations during the therapy session. Tr. 364-365. Mr. Davis noted that Borden continued "to exhibit racing thoughts and circumstantiality[.]" Tr. 365.

---

[5] No credentials were noted for Martale Davis. Tr. 363. The counseling notes were also signed by psychologist Frank Gorbett. Tr. 363.

On September 14, 2016, Mr. Davis noted mental status examination findings similar to those observed on August 31, 2016, except that he described Borden's mood as euthymic.  Tr. 368-369.  At that visit, Borden reported that she had "been in a better mood."  Tr. 369.  She had, however, had a physical altercation with her uncle but he had been leaving her alone since that incident.  Tr. 369.  Borden had been sleep walking and her husband found her by a swamp near their house.  Tr. 369.  Borden relayed that her doctors had not provided her with recommendations to address her sleep walking.  Tr. 371.  She continued to report hearing and seeing things that other individuals did not.  Tr. 371.  Borden had been trying to control her anger.  Tr. 371.

A week later, on September 21, 2016, Borden saw Mr. Davis and she reported suicidal ideation – she had thoughts about walking in front of a car.  Tr. 388.  Mr. Davis noted that Borden reported not having her psych medication and she was not scheduled to see a psychiatrist until the beginning of October.  Tr. 390.  She was having a hard time controlling her symptoms without her psych medication.  Tr. 390.  Borden was referred to Coleman Access for a pre-hospital screening.  Tr. 372-386, 390.  As part of that screening, Borden reported having a history of suicide attempts and multiple hospitalizations.  Tr. 372.  Borden reported having audio and visual hallucinations.  Tr. 372.  Borden agreed to a recommendation for inpatient treatment.  Tr. 372, 385.  When admitted to the hospital that day, Borden reported running out of her medications two months prior and she had been having racing thoughts, she could not sleep, and she could not concentrate.  Tr. 433.  Borden was started on 100 mg of Seroquel.  Tr. 433.  Borden's Adderall and trazodone were not continued.  Tr. 433.  Borden was discharged on September 24, 2016, with a diagnosis of mood disorder, not otherwise specified.  Tr. 408.  Her

GAF score was 10.[6]  Tr. 408.  She was discharged in stable condition; she was not suicidal or homicidal and she was compliant with her medications and tolerating them well.  Tr. 408.

On October 19, 2016, Borden presented to the emergency room at University Hospitals Portage Medical Center.  Tr. 914-916.  She reported suicidal ideation and was referred to Coleman for further psychiatric evaluation.  Tr. 915.  When seen at Coleman Access for pre-hospital screening (Tr. 539-553), Borden was anxious and tearful throughout the evaluation (Tr. 539).  Borden relayed that she had an altercation with her uncle and started to have suicidal ideation.  Tr. 539.  Borden's stepfather encouraged her to seek treatment at the hospital.  Tr. 539. Borden denied suicidal or homicidal ideation once at Coleman and wanted to be discharged home with a safety plan.  Tr. 539.  Borden relayed that her youngest child was ill and she wanted to go so she could take care of her.  Tr. 539.  It was noted that Borden had an upcoming psych appointment with Joanne Villegas and she was discharged home with a recommendation for follow-up calls.  Tr. 539.  Borden's diagnoses were bipolar disorder, unspecified; bipolar disorder, current episode manic severe with psychotic features; and posttraumatic stress disorder, unspecified and, her GAF score at that time was 46.  Tr. 551, 552.

Borden saw Joanne Villegas, CNP-BC, on October 31, 2016, for an initial psychiatric visit.  Tr. 554-560.  Borden relayed that she had been on Adderall from age 12 through May 2016 and, since stopping that medication, she had been having a difficult time focusing and concentrating and she lacked motivation to perform tasks.  Tr. 555.  On mental status examination, Nurse Villegas observed adequate grooming and hygiene; non-pressured speech with normal tone, volume and fluency; slightly anxious mood; full range of facial effect; thought

---

[6] A GAF score between 1 and 10 indicates "persistent danger of severely hurting self or others (e.g., recurrent violence) or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation of death."  DSM-IV-TR, at 34.

processes were linear goal oriented and coherent; attention and concentration were intact; insight and judgment were adequate.  Tr. 555-556.  Borden denied hallucinations and she reported no suicidal/homicidal ideation.  Tr. 555.  Nurse Villegas diagnosed major depressive disorder, recurrent, moderate and posttraumatic stress disorder, unspecified.  Tr. 557.  Borden's GAF score was 46.  Tr. 558.  Nurse Villegas continued Borden on Seroquel, Zoloft, and Zyprexa.  Tr. 559.  At Borden's request, Nurse Villegas stopped trazadone.  Tr. 559.  Nurse Villegas recommended that Borden continue with individual counseling.  Tr. 559.

A few days later, on November 3, 2016, Borden saw Nurse Villegas with her chief complaint being that her pharmacy had not received the prescriptions that were sent electronically and there was an issue with orders for laboratory testing.  Tr. 561.  Borden was less anxious than at her October 31, 2016, visit.  Tr. 561.  Borden's diagnoses were unchanged. Tr. 564.  Her GAF score was 52.[7]  Tr. 565.  Nurse Villegas noted that Borden was tolerating cessation of Wellbutrin and Vistaril.  Tr. 566.

On November 14, 2016, Borden had a follow-up appointment with Nurse Sims at AxessPointe.  Tr. 674-677.  Regarding Borden's bipolar disorder, Nurse Sims indicated that Borden was continuing to take Seroquel and olanzapine (Zyprexa).  Tr. 675.  Borden's mood was described as anxious.  Tr. 675.

On referral of Borden's psychiatric provider, on November 22, 2016, Borden saw Jill Thewlis, PCC, at Coleman, for an AOD diagnostic assessment (alcohol and other drug assessment).  Tr. 568-587.  On mental status examination, Ms. Thewlis observed average demeanor/behavior; average eye contact; clear but rapid speech; anxious mood (leg bouncing);

---

[7] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  DSM-IV-TR, at 34.

full affect; logical but racing thought process; no suicidal/homicidal ideation; and fair insight/judgment.  Tr. 580-581.  Ms. Thewlis indicated that Borden's thought content was unremarkable.  Tr. 581.  In the area of cognitive impairment, Ms. Thewlis checked the box captioned "unremarkable" but, she also checked the box captioned "attention/concentration."  Tr. 581.  Ms. Thewlis noted the following diagnoses: bipolar disorder, NOS; rule out bipolar disorder, manic, severe with psychotic features; rule out psychoactive substance dependence; and PTSD, unspecified.  Tr. 584.  Ms. Thewlis assessed a GAF score of 46.  Tr. 585.  Ms. Thewlis recommended that Borden continue with individual counseling and Borden was interested in doing so.  Tr. 586.

On December 16, 2016, Borden presented to the emergency room at University Hospitals Portage Medical Center with complaints of having suicidal thoughts for the prior few days.  Tr. 908.  Borden reported increased stress at home.  Tr. 908.  She relayed that her 16-year-old daughter ran away.  Tr 908.  Borden also indicated that there were people coming in her mother's house all the time and they were stealing her medication.  Tr. 908.  She was out of Klonopin and Dilantin because someone had stolen it.  Tr. 908.  Borden reported no homicidal ideation and she was not experiencing hallucinations.  Tr. 908.  She indicated that she had a suicide plan but she was not willing to share it.  Tr. 908.  Borden was placed on suicide precautions and Coleman agreed to accept transfer of care for further psychiatric evaluation.  Tr. 909.

Following a concern about GI bleeding, Borden had another hospital admission from December 22, 2016, through December 29, 2016, that included reports of severe anxiety and auditory and visual hallucinations.  Tr. 618.  Adjustments to Borden's psych medications were made, including restarting her on Adderall, adjustments to trazodone, and introduction of

Lamictal.  Tr. 618.  During her hospital admission, Borden showed improvement in her anxiety and depressive symptoms.  Tr. 618.

On February 24, 2017, Borden was admitted to the hospital for major depression with suicidal ideation.  Tr. 589-606.  Borden presented to the hospital with suicidal ideation after running out of her medication a few weeks earlier.  Tr. 589, 602.  Borden relayed that she had been unable to get her medication from Coleman.  Tr. 589.  It was unclear to the hospital providers why it had been an issue for Borden to get her medication from Coleman.  Tr. 589.  A call was placed to Coleman to try to get a better understanding of the issue relating to the medication but no call was received back from Coleman.  Tr. 589.  After Borden was restarted on her medication, Borden reported feeling "much better."  Tr. 589.  At the time of discharge on February 27, 2017, Borden was stable and denied suicidal or homicidal ideation.  Tr. 590.

Borden saw Mr. Davis on March 23, 2017, for counseling.  Tr. 713-716.  Borden relayed that "she [had] been doing well lately."  Tr. 716.  Borden did note, however, that she had some anxiety regarding her mother being released from prison; she did not know whether she and her mother would be able to get along in the same house because of their similar and strong personalities.  Tr. 716.  Mr. Davis' observations on mental status examination were unremarkable[8] (Tr. 713-714) and Mr. Davis indicated that Borden "appear[ed] stable[.]" (Tr. 714).

On March 28, 2017, Borden saw Susan Barker, CNP-BC, at Coleman for a psychiatric visit.  Tr. 695-700.  Borden relayed that her moods were bad.  Tr. 696.  Borden explained that she had again been off her medication, including Adderall, for four days because she ran out.  Tr.

---

[8] Examination findings included cooperative behavior; clear speech; euthymic mood; full affect; no reported delusions or hallucinations; logical thought process; no reported suicidal or homicidal ideation; no impairment of memory or attention/concentration; and fair insight/judgment.  Tr. 713-714.

696.  Borden was in agreement with remaining off Adderall.  Tr. 696.  Borden indicated that her moods were worse when she was off her medications.  Tr. 696.  Borden reported delusions and hallucinations – she explained that since childhood, she had been seeing and talking to "dead people[.]"  Tr. 697.  She denied hearing any commands or dangerous content.  Tr. 697.  Borden did not report suicidal/homicidal ideation.  Tr. 697.  Nurse Barker noted that Borden was cooperative and she had a full affect, she was "animated, talkative, friendly[.]"  Tr. 696.  Also, Nurse Barker observed that Borden's thought process was logical, racing, and circumstantial and she noted impairment in Borden's attention/concentration.  Tr. 697.  Nurse Barker recommended the following medication plan: discontinue Adderall (with Borden's agreement); start trial of Strattera for ADD; continue on Seroquel for mood; retitrate gabapentin for anxiety; continue trazadone for sleep; and discontinue Ambien that had been started for sleep but, per Borden, was no longer beneficial.[9]  Tr. 699.  Dr. Barker also recommended that Borden continue with case management services and counseling.  Tr. 700.

On April 6, 2017, Borden saw Mr. Davis for a counseling session.  Tr. 709-712.  Mr. Davis described Borden's mood as "concerned[.]"  Tr. 709.  Otherwise, mental examination findings were generally unremarkable.  Tr. 709-710.  Mr. Davis indicated that Borden "appear[ed] stable" (Tr. 710) and Borden reported being stable (Tr. 712).  However, Mr. Davis noted that Borden raised concerns over matters pertaining to her daughters.  Tr. 712.

Borden saw Mr. Davis again on May 4, 2017.  Tr. 705-708.  Mr. Davis' mental status examination findings were unremarkable.  Tr. 705-706.  Borden's mood was described as "euthymic[.]"  Tr. 705.  Borden was stable and reported no concerns at that time.  Tr. 706.

---

[9] Borden was also taking Klonopin per neurology for seizures.  Tr. 699.

On June 28, 2017, Borden saw Nurse Barker for a psychiatric visit.  Tr. 688-694.  Borden indicated she was "good" she had not "noticed any changes with the Strattera keeping [her] from being hyper but with everything else [she was] [okay.]"  Tr. 689.  Borden had been out of her seizure medication for four days and had three seizures during the period that she was without her medication.  Tr. 689.  Her primary care physician refilled one prescription (Dilantin) and her primary care physician suggested that she ask Nurse Barker to refill the other one (Klonopin) until she could get in to see her neurologist.  Tr. 689.  Borden reported compliance with and good benefit from her other medications.  Tr. 689.  She denied any suicidal or manic symptoms but she felt hyper at times.  Tr. 689.  Her sleep was "fair" without Ambien.  Tr. 689.  Borden was happy with her medication regimen and did not want any changes.  Tr. 689.  With respect to her mood, Borden stated "I'm doing okay[.]"  Tr. 689.  Nurse Barker noted that Borden's thought process was logical, circumstantial, and racing.  Tr. 689.  Nurse Barker referenced Borden's long history with seeing and talking to "dead people" but commented that there was no mention of preoccupation with audio or visual hallucinations that day.  Tr. 689-690.  Nurse Barker indicated that Borden's mood was stable and she continued Borden's medications.  Tr. 692.  She also provided Borden with a two-week supply of Klonopin, advising Borden it was a one-time event.  Tr. 692.  Nurse Barker also advised Borden of "risks including depressant effects and risk of [withdrawal] seizures."  Tr. 692-693.  She explained to Borden that Borden needed to follow up with her neurologist as soon as possible and her seizures could not be managed at Coleman.  Tr. 693.

On July 10, 2017, after having been discharged from the hospital for an epileptic episode, Borden saw Anna Wise[10] at Coleman for a counseling session.  Tr. 701-704.  On mental status

---

[10] No credentials were noted for Anna Wise.  Tr. 704.  The counseling notes were also signed by psychologist Frank Gorbett.  Tr. 704.

examination, Ms. Wise commented that Borden reported suicidal/homicidal ideation, indicating that Borden relayed "wanting to 'disappear or go away'" because "it would be 'easier[.]'" Tr, 702.  Also, Borden relayed that at times she wanted to "'knock out, like really knock out' her aunt's boyfriend." Tr. 702.  Borden's daughters were noted to be "protective factors for self-harm and for harm to others." Tr. 702.  Borden relayed that she was "depressed, anxious, [and] concerned about 'angry' thoughts, and only sleeping 2 hours per night." Tr. 702.  Borden did not feel that her medications were working and she stated she needed "the meds that [she] used to take." Tr. 702.  Ms. Wise discussed coping strategies with Borden and Borden agreed to try one of the coping strategies.  Tr. 704.

Borden saw Nurse Barker on October 16, 2017.  Tr. 732-738.  Borden relayed that she was "doing good but the Strattera [was not] doing anything and [she was] not sleeping." Tr. 733.  Borden was "stable" and she reported that her "mood [was] well controlled." Tr. 733.  She denied suicidal ideation.  Tr. 733.  Her audio and visual hallucinations were "no worse" and "no better[.]" Tr. 733.  Borden denied manic symptoms and reported that she was compliant with her medications.  Tr. 733.  Nurse Barker increased Borden's Strattera dosage and continued her other medications.  Tr. 736.

On October 19, 2017, Borden presented to the emergency room at Akron General Medical stating that she was sent to the emergency room "by her psychiatrist because her psychiatrist felt she needed to be admitted to the hospital for a change in her medication regimen." Tr. 1012-1013.  Borden relayed that she felt "strongly that she [did] not need to be admitted, but that she would indeed like to be started back on Adderall and Ambien in addition to her trazodone and Seroquel." Tr. 1013.  Borden denied recent issues with depression but relayed some decreased ability to sleep.  Tr. 1013.  She reported daily anxiety along with

13

excessive worrying and difficulty concentrating.  Tr. 1013.  Borden also relayed symptoms that were consistent with PTSD, e.g., nightmares, flashbacks, avoidance and hypervigilance.  Tr. 1013.  Borden indicated that she counted things compulsively and she had chronic irritability, decreased need for sleep, flight of ideas, and distractibility.  Tr. 1013. Borden occasionally heard voices but she felt that her medications were controlling the voices well.  Tr. 1013.  The emergency room assessment was anxiety disorder, unspecified and posttraumatic stress disorder.  Tr. 1014.  It was noted that Borden was not a risk to herself or others and she was not manic or psychotic at that time and could care for herself on an outpatient basis.  Tr. 1014.  Thus, Borden did not meet the criteria for inpatient psychiatric admission.  Tr. 1014.  Borden was discharged home and provided with a referral for a different psychiatrist in the event she wanted to establish care with a different provider.  Tr. 1014.

When Borden saw Nurse Barker on December 11, 2017, she relayed that she was "doing good" and "everything [was] doing great[.]"  Tr. 739.  Borden indicated that her cardiologist wanted her to stop taking Strattera – Borden had been off of it for two days and had planned to remain off of it.  Tr. 739.  Borden's mood had been "good and stable[]" and she denied suicidal ideation and mania.  Tr. 739.  Borden's mental status examination findings were normal or unremarkable.  Tr. 741-742.  Except for Strattera that was discontinued, Nurse Barker continued Borden's other medications.  Tr. 743.

Borden saw Ms. Wise on January 9, 2018, for a counseling session.  Tr. 778-781.  Ms. Wise described Borden's mood as anxious and tearful.  Tr. 778.  Borden reported a depressed mood, anxiety symptoms, and difficulty sleeping (including an increase in sleep walking incidents).  Tr. 779.  Borden relayed that she had recently been sleep walking and "'woke up to a truck blowing it's horn at [her]' because she had walked close to the road."  Tr. 779.  Borden

explained that Klonopin had helped in the past with her sleep walking but it was no longer effective.  Tr. 779.  Borden was having marital problems but her daughters were "doing 'really well[.]'"  Tr. 779.

Later that month, during a counseling session on January 29, 2018, Ms. Wise observed Borden to be more euthymic.  Tr. 769.  However, she was continuing to have ongoing audio and visual hallucinations; she felt she always had to be "on the move"; and she was continuing to have problems with her sleep, including sleep disturbances and sleep walking.  Tr. 770.  She was receiving housing assistance and was "relieved to have a home again."  Tr. 769.  Borden was working on her marital issues.  Tr. 770.  She relayed that she was "'busy cleaning to make some money' in order to buy things for her new apartment."  Tr. 770.

Borden saw Nurse Barker on March 6, 2018.  Tr. 746.  Borden stated: "everything's going good[.]"  Tr. 746.  She was still seeing "spirits" but with no changes or dangerous content.  Tr. 746.  Nurse Barker commented that Borden's mood remained stable and medications were continued.  Tr. 752.

When Borden saw Nurse Barker on May 7, 2018, she stated: "I'm doing ok[.]"  Tr. 754.  Borden's complaints related primarily to physical ailments.[11]  Tr. 754.  Nurse Barker noted that Borden's mood remained stable and she continued Borden's medications.  Tr. 760.  Nurse Barker increased Borden's gabapentin dosage which was prescribed for anxiety but also because it might help with Borden's pain.[12]  Tr. 760.

---

[11] Borden planned to seek emergency room treatment for her physical ailments following her appointment with Nurse Barker.  Tr. 754.

[12] Borden had reported increased sciatica and her neurologist recommended an increase in her gabapentin. Tr. 754, 760.

Borden saw Nurse Sims on May 8, 2018.  Tr. 1121-1124.  Borden reported that she had recently been treated at the hospital for chest pain.  Tr. 1121.  Borden relayed that "she was told by psychiatry that chest pain [was] likely due to her increased anxiety."  Tr. 1121.  With respect to the plan for treatment of Borden's bipolar disorder, Nurse Sims continued Borden's medications of Zyprexa (olanzapine) and Seroquel.  Tr.  1123.

During a July 26, 2018, hospital visit for complaints of recurrent seizures, Borden indicated that her seizures were triggered by stress and worrying.  Tr. 1021.  Borden had run out of Dilantin four days earlier.  Tr. 1021.  Borden's seizures were occurring two to three times per month even with seizure medication.  Tr. 1024.  Borden relayed that the longest she had gone without having a seizure was one month.  Tr. 1020.  Borden was admitted for treatment and testing relative to her seizures, including continuous video-EEG monitoring.  Tr. 1026-1029. After requesting discharge due to a family medical emergency, Borden was discharged on July 29, 2018.  Tr. 1027.

On September 19, 2018, Borden saw Tina Steen, CNP-BC, at Coleman for a psychiatric visit.  Tr. 762-768.  Borden relayed she was "good . . . just out of [her] medicine[.]"  Tr. 762. Borden's mood remained stable.  Tr. 762, 766.

On March 5, 2019, Borden saw Nurse Sims for medication refills, including for her bipolar affective disorder.  Tr. 1126, 1128.

## 2.   Opinion evidence

 Prior to the alleged onset date, Dr. John Haney, Ph.D., completed a consultative evaluation.  Tr. 316-318.  Dr. Haney diagnosed mood disorder, NOS, consider bipolar disorder, NOS; anxiety disorder, NOS, by history; attention deficit hyperactivity disorder, by history; posttraumatic stress disorder, chronic; rule out borderline intellectual functioning; and consider

borderline personality disorder.  Tr. 317.  Dr. Haney indicated that Borden's "[a]bility to function in most jobs appeared moderately to severely impaired due to chronic physical and emotional difficulties."  Tr. 317.

On October 3, 2017, Nurse Sims completed a medical report regarding Borden's medical impairments.  Tr.  719-721.  Nurse Sims listed Borden's multiple diagnoses including anxiety and bipolar disorder.  Tr. 719.  Nurse Sims also listed Borden's various medications, noting that they were effective and that there was good compliance.  Tr. 720.  She indicated that Borden continued to treat with different medical providers, including neurology and psychiatry, and that Borden's "[m]edications and frequent office visits have helped maintain fair control of all [diagnoses]."  Tr. 720.  Nurse Sims opined that Borden was "limited to <u>any</u> physical activity due to current physical disabilities that reduce activity endurance."  Tr. 720 (emphasis in original). There was no opinion offered regarding mental limitations.

On October 16, 2017, state agency medical reviewing psychologist Karla Delcour, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 65-66) and mental RFC assessment (Tr. 70-72).  In the PRT, Dr. Delcour opined that Borden had mild limitations in the areas of understanding, remembering, or applying information and adapting and managing oneself; and moderate limitations in the areas of interacting with others and concentrating, persisting, or maintaining pace.  Tr. 66.  In the mental RFC assessment, Dr. Delcour opined that Borden could understand, remember, and follow simple, repetitive instructions; she could maintain attention, concentration, persistence, and pace for routine tasks not requiring fast pace and without strict production quotas; she could "relate to familiar others occasionally on a superficial level"; and she could "perform simple, routine tasks in a static work environment."  Tr. 71-72.

Upon reconsideration, on December 15, 2017, state agency reviewing psychologist Kristen Haskins, Psy.D., completed a PRT (Tr. 100-101) and mental RFC assessment (Tr. 105-107).  In the PRT, Dr. Haskins opined that Borden had mild limitations in the area of understanding, remembering, or applying information; and moderate limitations in the areas of interacting with others; concentrating, persisting, or maintaining pace; and adapting and managing oneself.  Tr. 101.  In the mental RFC assessment, Dr. Haskins opined that Borden could understand, remember, and follow simple, repetitive instructions of 1-3 steps; she could maintain attention, concentration, persistence, and pace for routine, short cycle tasks not requiring fast pace and without strict production quotas where she can work away from others; she could "relate to familiar others occasionally on a superficial level"; and she could "work within a set routine where major changes are explained in advance and gradually implemented to allow [her] time to adjust to the new expectations[]" and her "ability to handle stress and pressure in the work place would be reduced, but adequate to handle tasks without strict time limitations or production standards."  Tr. 105-107.

## C.  Testimonial evidence

### 1.  Plaintiff's testimony

Borden was represented and testified at the hearing. Tr. 33, 36-50.

Per her doctor's orders, due to her seizures, Borden no longer drives.  Tr. 36.  Borden was taking medication for various impairments, including for seizures and depression and anxiety. Tr. 38-39.  She had been receiving treatment, including counseling services, from Coleman for at least three years.  Tr. 43-44.  Borden had stopped seeing her counselor a month or more prior to the hearing and was only seeing a psychiatrist.  Tr. 44.  She stopped seeing the counselor because

he made her feel crazy. Tr. 44. She noted that she should maybe see another counselor. Tr. 44. Borden indicated that the medications that her psychiatrist had her on helped. Tr. 44.

Because of her depression, Borden did not have the urge to do anything. Tr. 44. She also had problems with anxiety and she had panic attacks. Tr. 44. Borden relayed that she recently had a panic attack. Tr. 44-45. She was at one of her children's plays and had to get up and walk out because she could not breathe. Tr. 45. Feeling unable to breathe is a usual symptom associated with one of Borden's panic attacks. Tr. 45.

During the day, Borden tries to do things. Tr. 45. For example, she does laundry; she cleans; she sits outside; and she tries to attend events that her children are involved in. Tr. 45-46. Borden indicated that her concentration and memory were not good. Tr. 48. She had a hard time following along with television shows. Tr. 48. She forgets a lot of things. Tr. 48-49. For example, she explained that she forgets "even getting the kids up for school, or anything like that." Tr. 49. Borden indicated that she has angry outbursts and crying spells. Tr. 49. She hallucinates all the time. Tr. 49. Borden has compulsive behaviors, e.g., she counts things. Tr. 49. Also, Borden has manic episodes that sometimes occur daily. Tr. 49.

### 2. Vocational expert's testimony

A Vocational Expert ("VE") testified at the hearing. Tr. 50-56   The ALJ informed the VE that there was no past relevant work and then the ALJ asked the VE a series of hypotheticals. Tr. 51-52. First, the ALJ asked the VE whether there would be any jobs available to a hypothetical individual with the limitations contained in the RFC ultimately assessed by the ALJ. Tr. 52. The VE indicated there would be jobs available, including document specialist, office helper, and garment folder.[13] Tr. 53-54.

---

[13] The VE provided job incidence data for each of the identified jobs. Tr. 53.

Second, the ALJ asked the VE to consider the first hypothetical but to add an additional limitation, i.e., that the individual would be limited to occasional handling and fingering bilaterally.  Tr 54.  The VE indicated that, with that additional limitation, there would be no jobs available.  Tr. 54.

Third, the ALJ asked the VE to consider the first hypothetical but to add that the individual would be absent from work one day per week on an ongoing basis.  Tr. 54.  With that additional limitation, the VE indicated that there would be no jobs available.  Tr. 54-55.

Fourth, the ALJ asked the VE to consider the first hypothetical but to add that the individual would be off task in the work setting 33 percent of the time.  Tr. 55.  The VE indicated that, with that additional limitation, there would be no jobs available because unskilled work would be eliminated if an individual is off task more than 10 percent of the workday.  Tr. 55.

In response to questioning from Borden's counsel, the VE indicated that, if the second hypothetical, which included occasional handling, fingering and feeling bilaterally, was changed to sedentary exertional work rather than light, there would still be no jobs available.  Tr. 56.  Also, the VE indicated that, if the individual in the first hypothetical needed a supervisor to check in on her on an ongoing, consistent basis between three to five times during the day to be reminded to stay on task or complete a task, or to see if there was any seizure activity, there would be no competitive work available.  Tr. 56.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[14] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[15] claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

---

[14] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[15] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

20 C.F.R. §§ 404.1520, 416.920;[16] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his June 12, 2019, decision, ALJ made the following findings:[17]

1.     Borden meets the insured status requirements of the Social Security Act
       through September 30, 2017.  Tr. 17.

2.     Borden has not engaged in substantial gainful activity since January 1,
       2015, the alleged onset date.  Tr. 17.

3.     Borden has the following severe impairments: epilepsy, diabetes mellitus,
       chronic obstruction pulmonary disease (COPD), atrial fibrillation,
       depression, posttraumatic stress disorder (PTSD), attention deficit
       hyperactivity disorder (ADHD), bipolar disorder, mood disorder, and
       anxiety disorder.[18]  Tr. 18.

4.     Borden does not have an impairment or combination of impairments that
       meets or medically equals the severity of one of the listed impairments.  Tr.
       18-20.

5.     Borden has the RFC to perform light work as defined in 20 C.F.R. §
       404.1567(b) with the following additional limitations: she can occasionally
       climb ramps and stairs but cannot climb ladders, ropes, or scaffolds; she
       can frequently stoop and crawl; she must avoid concentrated exposure to
       temperature extremes of hot and cold, wetness, and humidity; she must
       avoid concentrated exposure to dusts, fumes, gases, odors, and poorly
       ventilated areas; she cannot perform any commercial driving; she must
       avoid exposure to workplace hazards such as unprotected heights and
       dangerous moving machinery; she can perform simple, routine tasks that

---

[16] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations
to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20
C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to
the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[17] The ALJ's findings are summarized.

[18] The ALJ also found that Borden had non-severe impairments.  Tr. 18.

do not involve arbitration, negotiation, or confrontation; she cannot direct the work of others or be responsible for the safety or welfare of others; she cannot perform piece rate work or assembly line work; and she can tolerate occasional interactions with others.  Tr. 20-23.

6.    Borden has no past relevant work.  Tr. 23.

7.    Borden was born in 1983 and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 23.

8.    Borden has a limited education and is able to communicate in English.  Tr. 24.

9.    Transferability of job skills is not an issue because Borden does not have past relevant work.  Tr. 24.

10.    Considering Borden's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Borden can perform, including document specialist, office helper, and garment sorter.  Tr. 24.

Based on the foregoing, the ALJ determined Borden had not been under a disability, as defined in the Social Security Act, from January 1, 2015, through the date of the decision.  Tr. 24.

## V. Plaintiff's Arguments

Plaintiff raises two arguments in her appeal.  Both arguments pertain to the ALJ's evaluation of her mental health impairments.  First, she argues that the ALJ's analysis of her subjective complaints is not supported by substantial evidence and therefore the mental RFC and Step Five finding are "tainted."  Second, she argues that the ALJ's analysis of the mental health opinion evidence is not supported by substantial evidence and therefore the mental RFC and Step Five finding are "tainted."

## VI. Law & Analysis

**A.**    **Standard of review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.**     **The ALJ did not err when assessing Borden's subjective complaints**

Borden argues that the ALJ erred in his evaluation of her subjective complaints.  Doc. 13, pp. 19-24.

A claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability.  20 C.F.R. § 404.1529(a); SSR 16-3p, 2017 WL 5180304.   When a claimant alleges impairment-related symptoms, a two-step process is used to evaluate those symptoms.  20 C.F.R. § 404.1529(c); 2017 WL 5180304, * 2-8.

First, a determination is made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, *e.g.*, pain.  SSR 16-3p, 2017 WL 5180304, * 3-4.

Second, once the foregoing is demonstrated, an evaluation of the intensity and persistence of the claimant's symptoms is necessary to determine the extent to which the symptoms limit the claimant's ability to perform work-related activities.  *Id.* at * 3, 5-8.  To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence.  SSR 16-3p, 2017 WL 5180304, * 5-8.

In addition to this evidence, the factors set forth in 20 C.F.R. 404.1529(c)(3) are considered.  2017 WL 5180304, *7-8.  Those factors include daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms.  *Id.*

"An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).

Here, when assessing Borden's psychological impairments and the consistency of Borden's subjective allegations regarding her symptoms with the record evidence, the ALJ stated:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because the record does not . . . reflect consistent efforts by the claimant to remain medicinally compliant with prescribed psychotropic medications.
>
> ***
>
> In terms of psychological limitations, I find the claimant can still perform simple, routine tasks that do not involve arbitration, negotiation, or confrontation.  The claimant cannot direct the work of others or be responsible for the safety or welfare of others.  The claimant cannot perform piece rate work or assembly line work.  The claimant can tolerate occasional interactions with others.  The claimant reports significant complications of depression, PTSD, and bipolar disorder, including auditory and visual hallucinations, poor motivation, suicidal ideations, and reduced tolerances for most forms of stress (hearing testimony).  The record does document multiple hospitalizations due to suicidal ideations and unstable moods (e.g., 5F17-18, 8F2, 15F18).  I have considered these multiple inpatient episodes in determining the claimant has reasonably established limitations in terms of coping with the worst of her mood exacerbations and stressors in her life.  That said however, it is important to note that each of the inpatient episodes documented in this record coincide with times when the claimant was not taking her prescribed psychotropic medications (e.g., 5F30, 8F2).  At some points, the claimant had been off her meds for months prior to the exacerbation in mood and behavior (5F30).  The record generally indicates the claimant's moods and behaviors are much more stable when she does take her prescribed medications, as evidenced by the lack of any emergency or inpatient episodes during such periods of compliance.  The claimant also has not been consistent in seeking out counseling for what she describes as serious disabling mood and behavioral disturbances.  She testified she has not been in counseling for some time now because she did not like her most recent counselor (hearing testimony).  It is difficult to arrive at the conclusion an individual has marked and breakthrough mental health symptoms when the individual has

26

frequently been non-compliant with taking prescribed medications and has not consistently been enrolled in counseling (e.g., 5F30, 8F2).

That said however, as the claimant has still shown some difficulties with complex and multi-step tasks during periods of stable moods.  She has struggled with tasks such as serial seven subtractions, and her motivation levels have been shown as reduced due to depressed moods (1F1, 7F35).  Thus and again, I do find the claimant has limits in terms of the complexity of tasks she can perform, the levels of stress involved in any potential work, and the pace demands of any prospective tasks.

Tr. 21, 22.

Borden contends that the ALJ's subjective allegations analysis is faulty because he did not consider whether Borden's bipolar disorder was the cause of her noncompliance with treatment.

"For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself."  *Burge v. Comm'r of Soc. Sec.*, 2013 WL 6837192, * 2 (N.D. Ohio Dec. 26, 2013) (quoting *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009)). Nevertheless, courts have found that this principle does not establish a "per se rule that the existence of any mental impairment(s) constitutes an acceptable reason for failure to follow prescribed treatment[.]" *Burge*, 2013 WL 6837192, *3 (discussing *Smith v. Astrue*, 2012 WL 6607007 (N.D. Ohio Dec. 18, 2012)).

Furthermore, SSR 16-3p explains that an individual's failure "to follow prescribed treatment that might improve symptoms" may be a basis for finding "the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." 2017 WL 5180304, * 9.  Such a finding will not be made "without considering possible reasons [the individual] may not comply with treatment or seek treatment consistent with the degree of his or her complaints."  *Id.*  However, as one court has explained:

> [T]o establish a severe mental impairment as an acceptable reason excusing a claimant's adherence to a medical regimen including prescription psychiatric medications, the record must contain evidence expressly linking noncompliance with the severe mental impairment. The justifiability of noncompliance is a step four determination as to which the claimant bears the burden of proof.

*Burge*, 2013 WL 6837192, * 3 (emphasis supplied).  "The requisite evidence of that link will preferably appear in an opinion or assessment by a medical source." *Burge*, 2013 WL 6837192, * 3.  If that type of evidence is lacking or not clear, "counsel for [the claimant] should request a consultative examination or testimony by a medical expert addressed expressly to the issue of a link between the mental impairment and failure to take prescription medication." *Id.*  Even if requested, the decision as to whether a medical expert should be called lies within the ALJ's discretion. *Id.* (citing inter alia *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (concluding, "An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary.")).

Borden asserts that there is evidence "expressly linking" her noncompliance to her bipolar disorder.  Doc. 13, p. 21.  In support of this claim, Borden asserts that courts have recognized that "[n]oncompliance with treatment is a common feature of bipolar disorder." *Id.*  Even so, Borden must point to evidence in the record showing that her noncompliance was in fact linked to her bipolar disorder. *See Burge, supra.*  Yet, she does not point to an opinion or assessment from a medical provider linking noncompliance to her mental impairment.  In fact, one of her medical providers, Nurse Sims, completed a medical form wherein she indicated that Borden's medications were effective and there was good compliance.  Tr. 720.

Instead, in an attempt to meet her burden of linking her noncompliance with her bipolar disorder, she argues that the record demonstrates that she "had several reasons for poor compliance, and these may or may not be related to bipolar disorder."  Doc. 13, p. 22 (emphasis

supplied).  The reasons she points to are: one alleged instance of confusion regarding whether she was taking Seroquel or Latuda; and her own assessment that her medication was ineffective or her thinking that obsolete medications were more effective.  Doc. 13, p. 22.  The Court finds that these arguments and/or the records cited to do not demonstrate the necessary "express" link between noncompliance and her bipolar disorder to warrant reversal and remand for further analysis of Borden's subjective complaints regarding her symptoms.

Borden also takes issue with the ALJ's consideration of Borden's more recent decision to stop seeing her counselor, arguing that the ALJ's discussion of Borden's testimony was "significantly under-nuanced . . . bordering on misleading[]."  Doc. 13, p. 23.  Borden argues that the ALJ's discussion of her attendance at counseling is misleading because she testified that she had not been to a counselor for "[a] month or so.  Maybe more." Tr. 44.  However, the ALJ stated that Borden "testified she has not been in counseling for some time now because she did not like her most recent counselor (hearing testimony)."  Tr. 22.  While the ALJ's summary of Borden's testimony is not an exact quote, the Court does not find it so misleading as to warrant reversal.  The ALJ clearly considered Borden's testimony and that testimony did reflect that Borden quit seeing her counselor because she did like how he made her feel.  Tr. 44.  Additionally, Borden's testimony reflects that she understood that she should probably see someone else.  Tr. 44.  This undermines any claim that her mental impairment impeded her ability to understand that she needed treatment for her mental health conditions.

Borden seeks to shift the burden of demonstrating a link between her bipolar disorder and noncompliance to the ALJ.  However, as noted above, that burden rests with Borden.  Moreover, Borden does not contend that she requested an examination or medical expert testimony to establish such a link.  Here, the ALJ considered the evidence of record, but did not find Borden's

allegations entirely consistent with the record.  It is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.

In sum, Borden contends that she "has shown that her medication compliance issues <u>may</u> have been due to bipolar disorder as required under *Burge*, 2013 WL 6837192, at *3."  Doc. 13, p. 23 (emphasis supplied).  However, for the reasons discussed herein, the Court finds that Borden has not shown that the ALJ ignored evidence when assessing Borden's subjective allegations nor has she demonstrated that the record contains "evidence <u>expressly linking</u> [her] noncompliance with [her] severe mental impairment."  *Burge*, 2013 WL 6837192, * 3 (emphasis supplied).  Accordingly, the Court finds that reversal and remand is not warranted for further analysis of Borden's subjective allegations regarding her mental health impairments.

**C.    The ALJ did not err in his evaluation of the mental health opinion evidence and the mental RFC is supported by substantial evidence**

Borden argues that the ALJ improperly found the non-examining mental health opinions persuasive; the ALJ's RFC is not meaningfully supported by a mental health opinion; and, because the ALJ dismissed the consultative examining opinion as stale, the ALJ should have sought additional medical evidence by ordering a consultative examination or recontacting Borden's physicians of record.  Doc. 13, pp. 24-27.

Since Borden's claim was filed after March 27, 2017, the Social Security Administration's ("SSA") new regulations for evaluation of medical opinion evidence apply to his claim.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence* (*Revisions to Rules*), 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

The new regulations set forth the various categories of evidence, which include (1) objective medical evidence; (2) medical opinions; (3) other medical evidence; (4) evidence from

non-medical sources; and (5) prior administrative medical findings.  20 C.F.R. § 404.1513(a)(1)-(5).

The new regulations provide that "administrative law judges will now evaluate the 'persuasiveness' of medical opinions by utilizing the five factors listed in paragraphs (c)(1) through (c)(5) of the regulation."  *Jones v. Comm'r of Soc. Sec.*, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020) (quoting *Gower v. Saul*, 2020 WL 1151069, at * 4 (W.D. Ky, March 9, 2020) (citing 20 C.F.R. § 404.1520c(a) and (b)); *see also Ryan L. F. v. Comm'r of Soc. Sec.*, 2019 WL 6468560, at *4 (D. Or. Dec. 2, 2019) ("Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'") (citing 20 C.F.R. §§ 404.1520c(a) and (b) (1), 416.920c(a) and (b) (1)) (alterations in original)).

The five factors are supportability, consistency, relationship with the claimant, specialization, and other factors, with supportability and consistency being the most important factors that are considered.  20 C.F.R. § 404.1520c(c)(1)-(5); 20 C.F.R. § 404.1520c(b)(2).  Therefore, administrative law judges "will explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [their] determination or decision."  20 C.F.R. § 404.1520c(b)(2).  The regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  And the "consistency" factor is explained as follows: "The more consistent a medical opinion(s) or prior

administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).

The regulations provide that administrative law judges "may, but are not required to, explain how [they] considered the factors in paragraphs(c)(3) through (c)(5) of this section, as appropriate, when [they] articulate how [they] consider medical opinions and prior administrative medical findings in [a claimant's] case record."[19]  20 C.F.R. § 404.152c(b)(2).

An ALJ, not a physician, is responsible for assessing a claimant's RFC.  *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009).  When assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding . . . [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*

Here, consistent with the regulations, the ALJ considered the medical opinion evidence, including the opinions rendered by the state agency reviewing consultants and consultative examining psychologist.  In doing so, the ALJ stated:

> As for medical opinion(s) and prior administrative medical finding(s), we will not defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from your medical sources.
>
> ***
>
> I find as persuasive the opinions of state agency psychologists Drs. Karla Delcour Ph.D. and Kristen Haskins Psy.D., who stated the claimant can perform simple,

---

[19] However, where administrative law judges find that there are equally persuasive medical opinions or prior administrative medical findings about the same issue but where they are not exactly the same, administrative law judges "will articulate how [they] considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in [a claimant's] determination or decision."  20 C.F.R. § 404.1520c(b)(3).

routine, repetitive instructions that do not require fast pace or strict production quotas, can relate to familiar others occasionally and superficially, and can work in a static environment (1A12-14, 5A11-13).  These two opinions are supported by narrative discussion and consideration of the claimant's treatment history of her psychological disorders.  Their stated conclusions are consistent with the claimant's post alleged onset date part time cleaning work, her conservative psychological care, and the claimant's repeated non-compliance with prescribed medications (e.g., 8F2, 5F30).

I find little persuasive effect in the opinion of consultative examiner Dr. John R. Haney Ph.D. (1F2).  Dr. Haney's opinion is supported by a limited period of the evidence of record, coming before much of the claimant's inpatient episodes and coinciding medicinal non-compliance.  His opinion ultimately is vague in its language, inconsistent with the claimant's recent lack of counseling, and inconsistent with recent part time work.

Tr. 22, 23.

Borden contends that the ALJ's finding that the non-examining opinions were supported is inaccurate because the opinions simply include conclusions not a narrative discussion.  Doc. 13, p. 25.  She argues that the narrative discussions in those medical findings are not properly attributable to the physicians.  *Id.*  Whether or not the physicians themselves wrote the narrative discussions, Borden has not demonstrated or shown that the non-examining psychologists did not consider the medical evidence, including evidence referenced in that narrative discussion.  Also, Borden has not shown that the ALJ's finding that the non-examining psychologists conclusions are consistent with evidence of record is unsupported by substantial evidence.  As explained above, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  The Court finds that the ALJ sufficiently explained his reasons for finding the opinions of the state agency psychological medical consultants persuasive.

Borden also claims that the ALJ's decision was "not meaningfully guided by a mental health professional."  Doc. 13, p. 26.  This contention is premised on Borden's claim that the

ALJ improperly found the state agency medical consultant's opinions persuasive and because the ALJ found the consultative examining psychologist's opinion unpersuasive, in part, due to its staleness.  Doc. 13, p. 26.  As discussed, the Court finds that the ALJ's finding with respect to the state agency medical consultant's opinions was not error.   Thus, even though the ALJ found the one-time examining psychologist's opinion unpersuasive, Borden has not shown that the ALJ's mental RFC is unsupported substantial evidence.

Additionally, while an ALJ has discretion to order a new consultative examination or recontact examining physicians, *see e.g.*, *Adams v. Colvin*, 2015 WL 4661512, * 17 (N.D. Ohio Aug. 5, 2015), Borden has not shown that the ALJ was obligated to do either.  Furthermore, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Poe*, 342 Fed. Appx. at 157.

Borden has not shown that the ALJ erred in his duty to develop the record or that the record evidence was insufficient such that the ALJ could not assess Borden's disability claim without seeking additional medical evidence.  Furthermore, the burden through Step Four of the sequential evaluation process rests with the claimant.  However, Borden did not submit a treating source opinion nor has she pointed to medical opinion evidence demonstrating that limitations beyond those included in the RFC were necessary in order to account for symptoms associated with her mental health impairment

 Considering the foregoing, the Court finds that the ALJ did not err in his evaluation of the medical opinion evidence.  Additionally, the Court finds that Borden has not shown that the mental RFC assessment is unsupported by substantial evidence.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: August 9, 2021

*/s/ Kathleen B. Burke*

Kathleen B. Burke
United States Magistrate Judge